# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARNIE HAMMEL,
  Plaintiff,

  v.

MARSH USA INC. and MARSH &
MCLENNAN COMPANIES, INC.
  Defendants.

**Civil Action No. 14-943 (CKK)**

## MEMORANDUM OPINION
(September 6, 2016)

Plaintiff Marnie Hammel filed suit against Marsh USA Inc. ("Marsh") and Marsh & McLennan Companies, Inc. ("MMC"), alleging violations of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code Ann. §§ 2-1401.01 *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Pregnancy Discrimination Act[1], arising out of Plaintiff's employment as a FINPRO Claims Advocate in Washington, D.C. Plaintiff alleges that her former employer, Defendant Marsh, discriminated against her on the basis of her sex, sexual orientation, marital status, parental status, and pregnancy, and retaliated against her for reporting harassment. Presently before the Court is Defendants' [37] Motion for Summary Judgment. Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as

---

[1] The Pregnancy Discrimination Act was incorporated into Title VII in 1978.

[2] The Court's consideration has focused on the following documents and their attachments and/or exhibits: Defs.' Motion for Summary Judgment, ECF No. [37]; Pl.'s Opposition to Defs.' Motion for Summary Judgment, ECF No. [42]; Defs.' Reply in Support of Motion for Summary Judgment, ECF No. [45]; Pl.'s Errata to Pl.'s Opp'n, ECF No. [46].

a whole, the Court shall GRANT-IN-PART and DENY-IN-PART Defendants' [37] Motion for Summary Judgment.

# I. BACKGROUND

## A. Factual Background[3]

Plaintiff Marnie Hammel, an attorney licensed to practice law in Pennsylvania and the District of Columbia, worked for Marsh[4] for approximately five years, from May 2007 to July 2012. *See* Defs.' Stmt. ¶¶ 22, 111. For the entirety of her employment with Marsh, Plaintiff worked as a Claims Advocate in Marsh's Financial Products and Liability Practice ("FINPRO") group, which "advises client[s] on financial and professional exposures or management liability exposures." *See id.* ¶¶ 3, 19, 80, 111; *see also* Pl.'s Opp'n, ECF No. [42], at 2-3. Marsh's Claims Advocacy Practice is a division of FINPRO that analyzes a client's exposures, assists clients in policy drafting, interacts with insurance carriers on behalf of clients involved in litigation, obtains insurance coverage and payments for clients, and consults with clients on issues that arise in the course of a complex claim negotiation and/or settlement. *See* Defs.' Stmt. ¶ 6; Pl.'s Resp. Stmt. ¶ 6. The Claims Advocacy Practice is a national practice, with employees located in certain Marsh offices across the United States from New York to San Francisco, which, during the time relevant to the claims in this suit, comprised approximately 12-14 full-time employees. *See* Defs.' Stmt. ¶ 7; Pl.'s Resp. Stmt. ¶ 7.

---

[3] The Court shall refer to Defendants' Statement of Material Facts ("Defs.' Stmt."), ECF No. [57-1], or directly to the record, unless a statement is contradicted by Plaintiff, in which case the Court may cite to Plaintiff's Response to the Defendant's Statement of Material Facts ("Pl.'s Resp. Stmt."), ECF No. [42–1].

[4] Defendant Marsh USA Inc. ("Marsh") is a wholly owned subsidiary of Marsh LLC, a Delaware limited liability company. *See* Defs.' Stmt. ¶ 1. Marsh LLC is wholly owned by Defendant, Marsh & McLennan Companies, Inc. ("MMC"), a publicly traded company. *Id.* ¶ 2.

1.  <u>Plaintiff Works in Marsh's Chicago Office from 2007 to 2009</u>

In early 2007, Plaintiff interviewed with several Marsh Managing Directors[5] in Chicago and New York, including:  Andrea Lieberman, at the time, the only FINPRO Claims Advocate in Chicago, David Nikolai, the Chicago FINPRO Practice Leader, and Lou Ann Layton, the head of the national FINPRO Practice.  *See* Defs.' Stmt. ¶ 12.  Plaintiff was subsequently offered a position in the Claims Advocacy Practice in Marsh's Chicago office as a Vice President ("VP"). Defs.' Stmt. ¶¶ 14, 19.  On April 4, 2007, Plaintiff signed a written job offer from Marsh for a Claims Advocate position, reporting to Ms. Lieberman.  *Id.* ¶ 19.  The offer letter specified that Ms. Hammel would have the officer title of VP and confirmed her annual base salary of $125,000, which was the amount that Ms. Hammel had negotiated with Marsh as part of the interview process.  *Id.* ¶¶ 14, 19; *see also* Pl.'s Offer Letter, Defs.' Ex. 11, ECF No. [37-3].  The offer letter also indicated that her compensation would be "considered for adjustment in succeeding years as part of our normal performance appraisal process."  Pl.'s Offer Letter, Defs.' Ex. 11, ECF No. [37-3].

Ms. Hammel worked in Marsh's Chicago Office reporting to Managing Director Andrea Lieberman from May 14, 2007 until March 30, 2009, when she officially transferred to Marsh's Washington, D.C. office.  *See* Defs.' Stmt. ¶ 22; Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 39:3-15.[6]  During that time, Ms. Lieberman was a direct, outspoken, and demanding boss.  *See*

---

[5] In the Marsh hierarchy, Managing Director is a senior position above Vice President and Senior Vice President.  *See* Layton Dep. Tr., Defs.' Ex. 5, ECF No. [37-3], at 26:4-5, Wallace Dep. Tr., Defs.' Ex. 14, ECF No. [37-3], at 20:2-4.

[6] Defendants argue that certain statements relied upon by Plaintiff in Opposition to Defendants' motion are hearsay.  The Court has reviewed the statements and concludes that they are not hearsay.  They are either statements of Plaintiff herself or constitute party admissions on behalf of Defendants.  *See* Fed. R. Evid. 801.

Defs.' Stmt. ¶ 23; Pl.'s Resp. Stmt. ¶ 23; Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 62:22-67:21, 152:8-12.   Plaintiff alleges, however, that Ms. Lieberman demanded more of Plaintiff in particular and that Ms. Lieberman was respectful and caring towards her other subordinates, but frequently disparaging of Ms. Hammel in public and in humiliating ways.   *See* Pl.'s Resp. Stmt. ¶ 23; Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 63:13-64:13.[7]

Plaintiff cites several incidents in July 2007 and November 2007 where Ms. Lieberman allegedly demanded that Ms. Hammel "suck it up and come into work" on days when Ms. Hammel had been sick with various illnesses, including a foot infection and bronchitis.   *See* Hammel Diary (Nov. 12, 2007), Defs.' Ex. 4B, ECF No. [37-3].   Plaintiff alleges that throughout her illnesses, Ms. Lieberman would call her multiple times a day, leaving voice mails and scheduling Ms. Hammel for client meetings and calls when she knew Ms. Hammel was too ill to work.   *See* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 58:3-18.   After these incidents, Plaintiff informed David Nikolai, the Chicago FINPRO Practice Leader, who allegedly said that Ms. Lieberman was a Managing Director and that there was nothing he could do.   *Id*. at 58:19-59:1.   Upon learning that Plaintiff had brought the matter to Mr. Nikolai's attention, Ms. Lieberman allegedly called Plaintiff into her office, looked Plaintiff in the eye, and said that Plaintiff had "some fucking nerve complaining about a managing director in this company," and that she put her hands on her desk, stood up, and yelled, "I'm your manager and I can be a bitch if I want to."   *See* Pl.'s Resp. Stmt. ¶¶ 25, 27; *see also* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 82:20-83:13.

---

[7] During the time in question, Ms. Lieberman supervised Ms. Hammel, as well as two other females in the office:  Mary Meinart, who was a paralegal at the Vice President level, and Nicole Sapienza, who was a secretary.   *See* Defs.' Stmt. ¶ 24; Pl.'s Resp. Stmt. ¶ 24.

In addition, Plaintiff alleges that Ms. Lieberman told Ms. Hammel, in front of other colleagues, that she was all "smoke and mirrors," that Ms. Lieberman was "surprised at how little" Ms. Hammel knew, and that it was Ms. Lieberman's "job to put [Ms. Hammel] in her place" and "cut her down to size." Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 79:15-80:05. Plaintiff also alleges that Ms. Lieberman expressed disbelief that Ms. Hammel had any friends and that Ms. Lieberman chastised co-workers for befriending Ms. Hammel. *Id*. at 61:04-22, 69:19-70:08. Plaintiff also alleges that throughout her time working under Ms. Lieberman, Ms. Lieberman heavily scrutinized her work travel and required her to report to the office unnecessarily before work trips. *Id*. at 59:8-61:3. Plaintiff contends that Ms. Lieberman did not raise her voice, use foul language, or impose comparable expectations regarding leave and travel with respect to other employees. *See id*. at 67:22-68:14; *see also* Hammel Decl., Pl.'s Ex. 2, ECF No. [42-2].

Plaintiff alleges that Ms. Lieberman specifically targeted Plaintiff because she is a lesbian and alleges that she did not fit within Ms. Lieberman's conception of a female subordinate employee. Plaintiff alleges that Ms. Lieberman made disparaging comments and belittling facial gestures when Ms. Hammel discussed her same-sex partner and that Ms. Lieberman made comments regarding Ms. Hammel's status as a gay woman. *Id*. at 69:07-18. On one occasion, Ms. Lieberman allegedly referenced Ms. Hammel's sexual orientation by asking if a friend who was visiting in the office was gay, and when Ms. Hammel responded that the individual was not gay, Ms. Lieberman allegedly responded, "no offense, but why would she be friends with you [Ms. Hammel] then." *Id*. at 69:19-70:08. Plaintiff also alleges that Ms. Lieberman routinely made fun of Ms. Hammel's style and manner of dress and made comments regarding Ms. Hammel's athleticism, allegedly stating in front of clients and co-workers, "that's how you are,

people like you"—which Ms. Hammel interpreted as a reference to her status as a lesbian.  *Id*. at 78:02-79:07.  Plaintiff also alleges that upon her nomination for a "superstar of the month" award, Ms. Lieberman asked Plaintiff whether the person who had nominated her for the award was gay.  *Id*. at 70:09-18.

Over the course of her time in Marsh's Chicago office, Plaintiff repeatedly complained of Ms. Lieberman's conduct to human resources, managers, and colleagues.  Defs.' Stmt. ¶¶ 27, 39; Pl.'s Resp. Stmt. ¶ 27, 39.  For example, Paul Denny, who in January 2008 took over for Mr. Nikolai as Chicago FINPRO Office Head, testified that Ms. Hammel came to him on at least ten occasions in 2008 with complaints about Ms. Lieberman.  Denny Dep. Tr., Defs.' Ex. 13, ECF No. [37-3], at 14:7-25.  Plaintiff alleges that upon her complaints to management, Ms. Hammel's supervisors frequently advised her that they were aware of the circumstances and that Ms. Hammel should "let it go."  Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 113:12-14.

On December 15, 2008, Ms. Lieberman met with Ms. Hammel, informed Ms. Hammel that she was aware of Ms. Hammel's allegations, and questioned Ms. Hammel as to "why she would make false allegations of illegal conduct to Marsh N.Y."  Pl.'s Resp. Stmt. ¶ 25h; Lieberman's 12/15/08 notes, Pl.'s Ex. 12, ECF No. [42-9]; Lieberman Dep. Tr., Defs.' Ex. 2, ECF No. [37-3], at 124:18-126:13.  Ms. Lieberman also contacted Human Resources and expressed her concern that "there was an employee who made allegations that were so grossly unsupportable by fact."  Lieberman Dep. Tr., Defs.' Ex. 2, ECF No. [37-3], at 131:3-132:1; Pl.'s Resp. Stmt. ¶ 25h.

In late 2008, Ms. Hammel requested a transfer from Chicago to Washington, D.C with the hope of getting a fresh start in a different office.  *See* Defs.' Stmt. ¶ 43; Pl.'s Resp. Stmt. ¶ 43; *see also* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 12:4-10.  Plaintiff alleges that Ms.

Lieberman, after learning that Ms. Hammel had requested a transfer to the Washington, D.C. office, called Ms. Hammel into her office and told her that "no one's job at this company is safe," that "a lot of people were being fired," that Ms. Hammel should "wait and see" as to whether she would keep her job, and that Ms. Hammel "had some nerve" requesting a transfer to a different office. *See* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 94:12-95:06. Ultimately, Ms. Hammel's transfer request was approved by several of FINPRO's seniors managers who believed that Ms. Hammel and Ms. Lieberman would both benefit from working in separate offices. *See* Defs.' Stmt. ¶ 43; Pl.'s Resp. Stmt. ¶ 43; Brew Dep. Tr., Defs.' Ex. 6, ECF No. [37-3], at 76:25-77:6; Layton Def. Tr., Defs.' Ex. 5, ECF No. [37-3], at 44:24-45:04. Plaintiff's transfer to the Washington, D.C. became effective March 30, 2009.  Defs.' Stmt. ¶ 47.

During her two years in Marsh's Chicago office, Plaintiff received one "merit raise"—a salary increase from $125,000 to $128,500 in 2008—but did not receive an end-of-year bonus or a promotion in either 2008 or 2009. *See* Defs.' Stmt. ¶¶ 76-79; Pl.'s Resp. Stmt. ¶¶ 76-79. Plaintiff, however, did receive $10,000 in 2009 to cover her moving expenses to Washington, D.C. *See* Defs.' Stmt. ¶ 79; Pl.'s Resp. Stmt. ¶ 79.

2. <u>Plaintiff Works in Marsh's Washington, D.C. Office from 2009 to 2012</u>

Although Plaintiff would have a new supervisor in the Washington, D.C. office, Plaintiff continued to work with Ms. Lieberman on projects during Plaintiff's time in the Washington, D.C. office. *See* Pl.'s Resp. Stmt. ¶¶ 25, 47; *see also* Hammel Emails, Pl.'s Exs. 15, 16, 17, ECF Nos. [44-3], [44-4], [44-5]. Plaintiff alleges that Ms. Lieberman would frequently reach out to Ms. Hammel for assistance on Chicago accounts and then would purposefully undermine Ms. Hammel's relationships with clients on those accounts. *See* Pl.'s Resp. Stmt. ¶ 47; Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 119:11-124:4.  Plaintiff also alleges that Ms. Lieberman attempted to undermine her career prospects at Marsh and that Plaintiff's new supervisors told

her that Ms. Lieberman and Mr. Nikolai "had basically poisoned the well" and that it was "not good to have an enemy in Dave Nikolai." Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 105:04-106:09.

Plaintiff also alleges that Ms. Lieberman attempted to ruin Ms. Hammel's wedding and related leave in September 2010 when Ms. Lieberman insisted that Ms. Hammel keep working on a Chicago account despite a request by the client's Managing Director to transfer the files back to Ms. Lieberman. *See* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 157:03-164:03; Mann Emails, Pl.'s Ex. 23, ECF No. [44-7]. A few weeks later, Ms. Hammel got married to her fiancée and took leave to go on her honeymoon. *See* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 157:03-164:03. Upon her return, Ms. Hammel received a written discipline for insubordination and refusing to perform work assigned to her. *See* Defs.' Stmt. ¶ 67, Pl.'s Resp. Stmt. ¶ 79. Following Ms. Hammel's receipt of the written warning in November 2010, Ms. Hammel contacted Human Resources to dispute the written warning and to complain of Ms. Lieberman's treatment of her. *See* Pl.'s Resp. Stmt. ¶ 25j. *See also* Hammel Emails, Pl.'s Exs. 15, 16, 17, ECF Nos. [44-3], [44-4], [44-5].

In February 2011, Ms. Hammel became pregnant with twins. *See* Defs.' Stmt. ¶ 94; Pl.'s Resp. Stmt. ¶ 94. On April 25, 2011, Ms. Hammel notified Human Resources that she was pregnant. Defs.' Stmt. ¶ 93. During Ms. Hammel's pregnancy, Marsh approved each of the accommodations requested by Ms. Hammel, including working from home certain days during her pregnancy and granting her request for 21 weeks of maternity leave. (October 10, 2011 – February 27, 2012). *See* Defs.' Stmt. ¶ 94; Pl.'s Resp. Stmt. ¶ 94.

While Ms. Hammel was on maternity leave, her supervisor, Damien Brew, lowered Ms. Hammel's prior performance rating of 4 to a rating of 3, or "Meets Expectations." *See* Pl.'s

Resp. Stmt. ¶ 94; Hammel 2011 Performance Review, Pl.'s Ex. 25, ECF No. [44-8].  On January 13, 2012, while Ms. Hammel was still on maternity leave, she received an email from Ms. Lieberman informing Ms. Hammel that "many people do work from home when they are out on maternity leave" and that she expected the same from Ms. Hammel.  Lieberman Emails, Pl.'s Ex. 26, ECF No. [42-17].  Ms. Hammel contacted Mr. Brew and Human Resources regarding the email, and Mr. Brew clarified that Ms. Hammel was not required to work while on maternity leave.  Brew Emails, Def.'s Ex. 34, ECF No. [37-5].  Mr. Brew and another executive, Paul Denny, were frustrated with Ms. Lieberman's behavior and agreed that Ms. Lieberman and Ms. Hammel should be separated.  *See* Pl.'s Resp. Stmt. ¶ 97, Brew Emails, Def.'s Ex. 34, ECF No. [37-5].  In an email from Mr. Brew to Mr. Denny, Mr. Denny commented, "[i]t is Ms. Lieberman's] one real weakness – Marnie.  I have coached her, I have tried lecturing to her and nothing gets through.  I know it's ridiculous but Andrea and Marnie should be kept apart as nothing good comes from them interacting with each other."  Brew Emails, Def.'s Ex. 34, ECF No. [37-5].

In late February 2012, Ms. Hammel returned from maternity leave.  Mr. Brew informed her that she had not received a promotion, and that she would not receive a raise or a bonus.  Hammel Decl., Pl.'s Ex. 2, ECF No. [42-2], at ¶ 14.  Later that spring, Mr. Brew and another executive, Ms. Layton, denied a request by Ms. Hammel to relocate to Tampa, Florida, stating that she would be "out of the loop" if she insisted on moving to Tampa because there was no FINPRO practice in Tampa.  Defs.' Stmt. ¶ 104.  In June 2012, Ms. Hammel announced that she was going to resign, and on July 11, 2012, Ms. Hammel worked her last day for Marsh.  Defs.' Stmt. ¶¶ 104-11; Pl.'s Stmt. ¶¶ 104-11.

During Ms. Hammel's three years in Marsh's Washington, D.C. office, Ms. Hammel did not receive a promotion, a raise, or a bonus. *See* Hammel Compensation History Report, Pl.'s Ex. 33, ECF No. [44-12]; *see also* Hammel Decl., Pl.'s Ex. 2, ECF No. [42-2], at ¶¶ 11-14; Pl.'s Stmt. ¶¶ 106.

### B. Procedural History

Six days after her resignation, on July 17, 2012, Ms. Hammel filed Charges of Discrimination with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Office of Human Rights ("DCOHR"), alleging that she was constructively discharged on June 26, 2012, and asserting discrimination on the basis of her sex, age,[8] sexual orientation, maternity, and retaliation. Def.'s Stmt. ¶ 112. Ms. Hammel filed suit on April 25, 2014, in the Superior Court for the District of Columbia, alleging twenty claims: 13 claims under the DCHRA, 5 claims under Title VII, and 2 claims under the Pregnancy Discrimination Act. *See generally* Compl., ECF No. [1-1]. Defendants removed the case to the United States District Court for the District of Columbia on June 6, 2014.

On February 10, 2015, the Court issued a Memorandum Opinion and Order dismissing Plaintiff's Title VII claims against Defendant MMC for failure to exhaust administrative remedies and dismissing Plaintiff's constructive discharge claims to the extent that they are asserted as independent bases for liability. *See* Mem. Opinion and Order (Feb. 10, 2015), ECF Nos. [13], [14]. Accordingly, the following 18 claims are currently before the Court:

---

[8] Ms. Hammel does not allege age discrimination in this suit.

(1)     Sex Discrimination  – Hostile Working Environment  and Harassment – DCHRA;
(2)     Sex Discrimination  – Disparate Treatment in Pay and Promotions – DCHRA;
(3)     Sexual  Orientation  Discrimination  – Hostile  Working  Environment  and Harassment – DCHRA;
(4)     Sexual  Orientation  – Disparate Treatment in Pay and Promotions – DCHRA;
(5)     Retaliation  – Hostile Working Environment  and Harassment – DCHRA;
(6)     Retaliation  – Disparate Treatment in Pay and Promotions – DCHRA;
(7)     Pregnancy  Discrimination  – Hostile  Working  Environment  and Harassment – DCHRA;
(8)     Pregnancy  Discrimination  – Disparate  Treatment  in Pay and  Promotions  – DCHRA;
(9)     Parental Status - Hostile Working Environment  and Harassment – DCHRA;
(10)    Parental Status - Disparate Treatment in Pay and Promotions  – DCHRA;
(11)    Marital Status - Hostile Working Environment  and Harassment – DCHRA;
(12)    Marital Status – Disparate Treatment in Pay and Promotions – DCHRA;
(13)    Sex Discrimination  – Hostile Working Environment  and Harassment – Title VII;
(14)    Sex Discrimination  – Disparate Treatment in Pay and Promotions – Title VII;
(15)    Retaliation  – Hostile Working Environment  and Harassment – Title VII;
(16)    Retaliation  – Disparate Treatment in Pay and Promotions – Title VII;
(17)    Pregnancy  – Hostile  Working  Environment  and Harassment  – Pregnancy Discrimination  Act; and
(18)    Pregnancy  – Disparate  Treatment  in Pay and Promotions  – Pregnancy Discrimination  Act.

*See id.; see also* Compl., ECF No. [1-1].

On December 4, 2015, Defendants filed a Motion for Summary Judgment on all 18 remaining claims.  *See* Defs.' Motion, ECF No. [37].  Plaintiff opposes Defendants' motion.  *See* Pl.'s Opp'n, ECF No. [42].  The motion is now fully briefed and ripe for resolution.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient  on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing  law will properly  preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). Be that as it may, the plaintiff is not relieved of her burden to support her allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, then at the summary judgment stage she bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557 (2009). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III. DISCUSSION

Based on the Court's prior order in this case, Plaintiff now alleges 18 claims of discrimination and/or retaliation under the District of Columbia Human Rights Act ("DCHRA") and Title VII of the Civil Rights Act, as amended ("Title VII"). These 18 claims may properly be considered to fall in three categories: (1) claims alleging disparate treatment in pay, (2) claims alleging illegal failures to promote / denials of promotions, and (3) claims alleging a hostile work

environment.   The court shall first address the parties' arguments concerning whether or not Plaintiff's claims are barred by the applicable statutes of limitations.

### A.  Statute of Limitations

Defendants contend that (1) Plaintiff's DCHRA claims pre-dating July 17, 2011—one year prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012—are time barred under the DCHRA and that (2) Plaintiff's Title VII claims pre-dating September 20, 2011—300 days prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012—are time barred under Title VII.  *See* Defs.' Mem., ECF No. [37-1], at 14 (citing D.C. Code § 2-1403.16(a); *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 503 (D.C. 2002); 42 U.S.C. § 2000e–5(e)(1); *Dyson v. D.C.*, 710 F.3d 415, 418 (D.C. Cir. 2013)).

In response, Plaintiff contends that her claims are not barred by the applicable statutes of limitations because she has stated a continuing violation from 2007 until the date of her alleged discharge in 2012.  *See* Pl.'s Opp'n, ECF No. [42], at 17-18.  Plaintiff also contends that Defendants have untimely raised the statute of limitations arguments, and that they waived their rights to raise a timeliness argument because they failed to do so in their 12(b)(6) motion.  *See* Pl.'s Opp'n, ECF No. [42], at 17-18.

As a preliminary matter, Plaintiff's argument regarding waiver is unavailing and contrary to the applicable Rules of Civil Procedure and controlling case law.  First, Plaintiff's reliance on Federal Rule of Civil Procedure 12(g)(2) is misplaced—Rule 12(g)(2) is valid with respect to multiple motions under Rule 12, not Rule 56.  *See* Fed. R. Civ. Pro. 12(g)(2); *see also Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 734 (D.C. 2000).  Furthermore, even if Rule 12(g)(2) were applicable to the instant case, Defendants would not have waived their right to raise a statute of limitations defense because they have raised this defense in their Answer filed

with the Court on March 2, 2015, ECF No. [15], at 50.  *See Kim v. United States*, 707 F.3d 335, 336 (D.C. Cir. 2013).  Accordingly, the Court finds that Defendant have not waived their rights to raise a statute of limitations defense as to Plaintiff's claims.

The Court shall now address the validity of the parties' arguments with respect to the applicable statute of limitations regarding each of Plaintiff's claims.

     i.    <u>Disparate Pay Claims brought under Title VII (Claims 15, 17, and and 20)</u>[9]

Pursuant to Title VII, "in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within ***three hundred days*** after the alleged unlawful employment practice occurred [.]" 42 U.S.C. § 2000e–5(e)(1) (emphasis added).  However, the applicable statute of limitations period for claims alleging "discrimination in compensation" under Title VII is determined specifically by 42 U.S.C. § 2000e–5(e), as amended by the Lilly Ledbetter Fair Pay Act of 2009,[10] which provides that:

> (3)(A) For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or ***when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.***
>
> (B) . . . "[L]iability may accrue, and an aggrieved person may obtain relief . . . including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the

---

[9] Plaintiff has brought Claim 20 pursuant to the Pregnancy Discrimination Act, which was incorporated into Title VII in 1978.

[10] *See* Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), Pub.L. No. 111–2, 123 Stat. 5 (Jan. 29, 2009).

charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

*Id.* § 3 (emphasis added). In other words, "each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred because of a failure to exhaust administrative remedies within 180 days of the original discriminatory compensation decision or practice." *Johnson v. D.C.*, 632 F. Supp. 2d 20, 21 (D.D.C. 2009); *see also Schuler v. PricewaterhouseCoopers*, LLP, 595 F.3d 370, 375 (D.C. Cir. 2010) (discussing purpose of Lilly Ledbetter Fair Pay Act of 2009 and the law's effects on the analysis of the statute of limitations under Title VII).

Here, the record evidence demonstrates that Plaintiff was continuously employed by Marsh between 2007 and 2012. Accordingly, Plaintiff's disparate pay claims under Title VII—which concern "unlawful employment practices" allegedly occurring between 2007 and 2012—would not be barred pursuant to 42 U.S.C. § 2000e–5(e)(3) because Plaintiff's statute-of-limitations clock effectively resets each time she received a paycheck from Marsh. *See* 42 U.S.C. § 2000e–5(e)(3); *Johnson*, 632 F. Supp. 2d at 21. Accordingly, the Court finds that the disparate pay claims brought by Plaintiff pursuant to Title VII—Claims 15, 17, and 20—are not barred by the applicable statute of limitations set forth in U.S.C. § 2000e–5(e)(3). *See id.*

The Court notes in particular that Claim 17, which is described in the Complaint as a "retaliation claim," is not barred under 42 U.S.C. § 2000e–5(e). Section 2000e–5(e), which, on its face, applies to "discrimination in compensation," was amended by the Ledbetter Fair Pay Act of 2009 in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 632 (2007). In *Ledbetter*, the plaintiff's claims of sex discrimination "turned

principally on the misconduct of a single Goodyear supervisor, who, [the plaintiff] testified, *retaliated* against her when she rejected his sexual advances during the early 1980's, and did so again in the mid–1990's when he falsified deficiency reports about her work." 550 U.S. at 632 n.4 (emphasis added). Likewise, in this case, Plaintiff has alleged that Defendants have retaliated against her on the basis of sex, claiming that they denied her meritorious bonuses and raises in reprisal for reporting acts that she believed to constitute sexual harassment and discrimination. Accordingly, the Court finds that the Ledbetter Fair Pay Act of 2009, which was expressly passed to overturn the outcome in *Ledbetter*, is intended to cover the unique circumstances of this case, where Plaintiff has alleged a retaliatory disparate pay claim under Title VII and her claim is based on actions allegedly taken in response to the reporting of discrimination on the basis of sex. *See id.*

ii.   Disparate Pay Claims brought under DCHRA (Claims 2, 4, 6, 8, 10, and 12)

Pursuant to the DCHRA, "[a]ny complaint [under the DCHRA] shall be filed . . . within 1 year of the occurrence of the unlawful discriminatory practice, or the discovery thereof [.]" D.C. Code § 2-1403.03. Unlike Title VII, the DCHRA contains no provision that specifically provides for the triggering of new filing periods with each paycheck for the purpose of bringing a discriminatory pay claim. *See id.* As such, the Court must examine whether Plaintiffs' disparate pay claims—to the extent that they rely on events allegedly occurring before July 17, 2011, one year prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012—can be brought pursuant to the DCHRA under the alternative theory of "continuing violations." *See* Pl.'s Opp'n, ECF No. [42], at 17-18.

"[A] 'continuing violation' is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become

clear until it was repeated during the limitations period, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." *Keohane v. United States*, 669 F.3d 325, 329 (D.C. Cir. 2012) (quoting *Taylor v. F.D.I.C.*, 132 F.3d 753, 765 (D.C. Cir. 1997)). As relevant to this case, the District of Columbia Court of Appeals (the "D.C. Court of Appeals") had held that disparate pay claims do not constitute "continuing violations" for the purposes of determining whether these claims are barred by the applicable one-year statute of limitations under the DCHRA. *See Zuurbier v. MedStar Health, Inc.*, 895 A.2d 905, 913 (D.C. 2006). In that case, the D.C. Court of Appeals relied on the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), in which the Supreme Court expressly limited the applicability of the "continuing violation" theory to restore claims that would otherwise be untimely under the applicable statute of limitations. *See Zuurbier*, 895 A.2d at 912-13; *Morgan*, 536 U.S. at 113-14.

The Court further notes that in the pre-*Ledbetter*, Title VII context, the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") expressly held that disparate pay claims not filed within the applicable statute of limitations cannot be saved under a "continuing violation" theory because disparate pay claims involve "separate acts of discrimination." *Shea v. Rice*, 409 F.3d 448, 451 (D.C. Cir. 2005). The Court also notes that two years later, in *Ledbetter*, the Supreme Court similarly rejected an argument that disparate pay claims not filed within the applicable statute of limitations can be saved under a "continuing violation" theory. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 621-32 (2007). Those decisions are no longer applicable to disparate pay claims in the Title VII context because the United States Congress has amended Title VII to expressly toll the statute of limitations each pay period, thereby expanding the time period allowed to bring disparate pay claims under Title VII. *See* 42 U.S.C. § 2000e–

5(e)(3); *see also* Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), Pub.L. No. 111–2, 123 Stat. 5 (Jan. 29, 2009).

The DCHRA, however, has not been similarly amended so as to expand the allowable time period to bring disparate pay claims. *See* D.C. Code § 2-1403.03. Accordingly, the Court finds that Plaintiff's disparate pay claims do not constitute "continuing violations" for the purposes of the DCHRA, and that Plaintiff is barred from raising any disparate pay claims pursuant to the DCHRA (Claims 2, 4, 6, 8, 10, and 12), to the extent that the allegations underlying those claims involve actions that allegedly took place before July 17, 2011—one year prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012. Plaintiff is not barred from asserting disparate pay claims pursuant to DCHRA concerning events occurring after July 17, 2011.

### iii.   Failure-to-Promote Claims (Claims 2, 4, 6, 8, 10, 12, 15, 17, and 20)

According to the United States Supreme Court, discrete actions such as "termination, *failure to promote*, denial of transfer, or refusal to hire" are considered separate actionable "unlawful employment practices" that cannot be viewed as "continuing violations." *Morgan*, 536 U.S. at 114 (emphasis added). In addition, the D.C. Circuit has held that "***the decision whether to promote an employee to a higher paying position***" is not a "discriminatory compensation decision or other practice" under the Ledbetter Act. *Schuler v. PricewaterhouseCoopers*, LLP, 595 F.3d 370, 374–75 (D.C. Cir. 2010) (emphasis added). Accordingly, Plaintiff's failure-to-promote claims brought pursuant to Title VII are barred to the extent that they are based on allegations before September 20, 2011—300 days prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012—and Plaintiff's failure-to-promote claims brought pursuant to the DCHRA are barred to the extent that they are based on allegations before July 17, 2011—one year prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012. *See* D.C.

Code § 2-1403.16(a); *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 503 (D.C. 2002); 42 U.S.C. § 2000e–5(e)(1); *Dyson v. D.C.*, 710 F.3d 415, 418 (D.C. Cir. 2013).

    iv.  <u>Hostile Work Environment Claims (Claims 1, 3, 5, 7, 9, 11, 14, 16, and 19)</u>

  Finally, both the D.C. Circuit and the Supreme Court have held that a hostile work environment claim may constitute a single "unlawful employment practice" so long as "at least one act"—even if it is not actionable on its own—falls within the charge filing period. *Morgan*, 536 U.S. at 122; *Singletary v. D.C.*, 351 F.3d 519, 527 (D.C. Cir. 2003). As such, a hostile work environment claim, unlike the "discrete acts" discussed above, may properly be viewed as a "continuing violation" under both Title VII and the DCHRA. *See Morgan*, 536 U.S. at 122; *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003). Put another way, "if an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Lively*, 830 A.2d at 890 (quoting *Morgan*, 536 U.S. at 117).

  In this case, Ms. Hammel's hostile work environment claims are essentially premised on her allegations that Ms. Lieberman frequently directed disparaging comments at Ms. Hammel in front of coworkers, that Ms. Lieberman demanded that Ms. Hammel work and respond while on leave, and that Ms. Lieberman attempted to undermine Ms. Hammel's reputation with her coworkers and clients. The Court finds that at least one of the actions allegedly taken by Ms. Lieberman occurred within the statutes of limitations provided under Title VII and the DCHRA. Specifically, on January 13, 2012, while Ms. Hammel was still on maternity leave, she received an email from Ms. Lieberman informing Ms. Hammel that "many people do work from home when they are out on maternity leave" and that she expected the same from Ms. Hammel. Lieberman Emails, Pl.'s Ex. 26, ECF No. [42-17]. Ms. Lieberman then followed up with Ms.

Hammel's supervisor, Mr. Brew, asking "[w]hy can't she do this from home? I did work while I was out on maternity leave. You need to talk to her." Lieberman Email to Brew, Pl.'s Ex. 38, ECF No. [42-24]. When Ms. Hammel contacted Mr. Brew and Human Resources regarding Ms. Lieberman's email, Mr. Brew clarified that Ms. Hammel was not required to be working while on maternity leave. Brew Emails, Def.'s Ex. 34, ECF No. [37-5]. When viewed in light of Plaintiff's other allegations, the emails in January 2012—while they may not be actionable on their own— appear to be of a sufficiently similar nature as the events that allegedly occurred outside the allowable time period, such that Ms. Hammel could assert a single "continuing violation" claim of a hostile work environment. *See Morgan*, 536 U.S. at 122; *Lively*, 830 A.2d at 890. Accordingly, the Court finds that Plaintiff's hostile work environment claims are not barred by the applicable statutes of limitations under both Title VII and the DCHRA. *See Morgan*, 536 U.S. at 122; *Lively*, 830 A.2d at 890.

Having examined whether or not Plaintiff's claims are barred by the applicable statutes of limitations, the Court shall now address the parties' remaining arguments regarding Plaintiff's claims.

### B. Disparate Pay (Claims 2, 4, 6, 8, 10, 12, 15, 17, and 20)

In claims 2, 4, 6, 8, 10, 12, 15, 17, and 20, Plaintiff claims that Marsh illegally denied compensation based alternatively on her sex, pregnancy, marital status, parental status, sexual orientation, and/or as retaliation for complaining about discrimination.

Defendants contend that Plaintiff has failed to establish a prima face case of disparate treatment discrimination or retaliation under either Title VII or the DCHRA. *See* Defs.' Mem., ECF No. [37-1], at 14-16.

To establish a *prima facie* case of disparate treatment discrimination on any protected status alleged by Ms. Hammel, she must (1) be a member of the relevant protected group; (2) show that she was entitled to or otherwise eligible for a higher salary or a raise or an annual bonus; and (3) other *similarly situated* Marsh employees who are male and/or not a parent and/or not married and/or not lesbian and/or not pregnant and/or did not complain of discrimination were granted pay increases and/or annual bonuses. *See, e.g., Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) (pregnancy discrimination under Title VII and DCHRA); *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (Title VII retaliation); *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) ("*Baird I*") (Title VII sex discrimination); *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 385 (D.C. 2002) (marital status); *Blocker-Burnette v. D.C.*, 842 F. Supp. 2d 329, 337 (D.D.C. 2012) (parental status); *Vogel v. D.C. Office of Planning*, 944 A.2d 456, 463 (D.C. 2008) (DCHRA retaliation); *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 502 (D.C. 2002) (sexual orientation); *McFarland v. George Washington Univ.*, 935 A.2d 337, 346 (D.C. 2007) (DCHRA sex discrimination).

However, it is well-established that "it is no longer relevant" if Plaintiff established a prima facie case once Defendants have proffered a non-discriminatory explanation for their conduct. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Because Defendants have proffered allegedly non-discriminatory reasons for their failure to more fully compensate Ms. Hammel, setting forth facts to establish a prima facie case would be "an unnecessary sideshow." *Brady v. Sgt. at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, this Court "need not- and should not decide" whether the Plaintiff has made out a prima facie case. *Id.* (emphasis in original). This Court need only determine whether Ms. Hammel has "produced sufficient evidence for a reasonable jury to find the [Defendants'] non-discriminatory reason was not the actual reason and

that the employer intentionally discriminated against the employee on the basis of" a protected status. *Id.*

Here, Defendants contend that Plaintiff "accepted" the salary offered upon hire and that she did not receive any salary increases or bonuses because they were "discretionary," and "it was common that FINPRO employees, such as Ms. Hammel, did not receive salary increases or bonus awards from year to year." Defs.' Mem., ECF No. [37-1], at 9. Defendant further assert that employees across the company "typically do not receive raises or bonuses from year to year." *Id.* Defendants also note that Ms. Hammel's salary increased from $125,000 to $128,500 in 2008 while reporting to Ms. Lieberman, and that Ms. Hammel received a "$10,000 bonus in 2009." *Id.*

Defendants further argue that "there is no evidence whatsoever that any similarly situated person outside of any of the protected categories Ms. Hammel asserts was treated more favorably in terms of pay, pay increases, or annual bonus awards." *See id.* at 15 (citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 386 (D.C. 2002) ("To sustain her burden, [a plaintiff] must show that she was treated differently from a [fellow] employee, all of whose relevant employment aspects were "nearly identical" to hers.")).

Plaintiff, in response, contends that Defendants erroneously seek to compare Ms. Hammel to "all FINPRO employees" and all "employees at Marsh." Pl.'s Opp'n, ECF No. [42], at 20. According to Plaintiff, the "employees who were similarly situated to Ms. Hammel were the other FINPRO CAs," and "[t]hese comparator employees generally received increases in compensation from year to year." *Id.* Plaintiff contends that in the time period relevant to her claims—2007 to 2012—Ms. Hammel was paid a "statistically significantly lower salary each year . . . relative to the average salary of other comparable employees within the FINPRO claims advocacy group." *Id.* Plaintiff also argues that her annual performance ratings "were not significantly lower than

other employees with similar FINPRO CA work experience" and that in 2010 and 2011, she had "annual performance ratings that were *significantly higher* than the average rating of comparable employees, yet she received no bonus." *Id.* at 21 (emphasis in original).

Plaintiff further argues that Defendants' explanations are pretext. She contends that she "was not paid commensurate with heterosexuals and those who had not engaged in protected EEO activity" and that "[o]ther male CAs who were doing the same work as Ms. Hammel were also paid considerably more than what Defendants paid Ms. Hammel." *Id.* at 23 (citing Pl.'s Ex. 5). Plaintiff further contends that Defendants' compensation system was "so subjective and vague that it permitted this kind of unfettered discretion that led to discriminatory and retaliatory decisions about Ms. Hammel's compensation." *Id.* at 24.

Before going further, the Court stops to comment that the parties vigorously dispute many of the following facts. It is true that Plaintiff relies very heavily on her own testimony as evidence of pretext. The Court makes no determination as to the truth of these matters. In the end, this is a case that, in large measure, will turn on credibility determinations and the drawing of inferences that are the province of the jury.

That being said, upon review of the parties' submissions and the record evidence as a whole—which includes expert reports submitted by both sides—the Court finds that Plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was pretextual. *See Brady*, 520 F.3d at 494. As a preliminary matter, the Court notes that Plaintiff has produced evidence to raise a triable question of fact as to whether Ms. Hammel performed work comparable to other Claims Advocates in the FINPRO group who were paid higher salaries and received more frequent bonuses or larger bonuses. For example, Plaintiff—who for much of her time at Marsh was the only Claims Advocate at the Vice President

level in the FINPRO group—produced evidence suggesting that she met all of the "SVP goals" set by Lou Ann Layton, the head of the national FINPRO Practice, in March 2010. *See* Emails re: SVP Goals, Pls.' Ex. 22, ECF No. [42-15]; Defs.' Exs. 25-27, ECF No. [37-3]. Additionally, Plaintiff testified that during the last three months of her employment with Marsh in 2012, she handled the entire portfolio of a heterosexual female Senior Vice President who was on maternity leave, as well a third of the portfolio of a male Senior Vice President who left Marsh's New York office in the spring of 2012. *See* Hammel Dep. Tr., Defs.' Ex. 4, ECF No. [37-3], at 103:01-104:09. A reasonable jury could decide to draw an inference from such evidence that Plaintiff performed work as a Claims Advocate at the Senior Vice President level, and thereby merited comparable compensation with Senior Vice Presidents who are male and/or not a parent and/or not married and/or not lesbian and/or not pregnant and/or did not complain of discrimination were granted pay increases and/or annual bonuses. *See id.*

The Court also notes that Plaintiff has also produced evidence from which a jury could conclude that decisions regarding Ms. Hammel's compensation were made in temporal proximity to Ms. Hammel's complaints of harassment to her managers and to Human Resources—or that such decisions constituted a "pattern of antagonism"—and could draw an inference from such evidence that Defendants' proffered explanations concerning Ms. Hammel's compensation are pretextual. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012); *Taylor v. Solis*, 571 F.3d 1313, 1323 (D.C. Cir. 2009). Obviously, the jury could also decide not to draw the inferences supporting Plaintiff's claims.

### C. <u>Failure to Promote (Claims 2, 4, 6, 8, 10, 12, 15, 17, and 20)</u>

In claims 2, 4, 6, 8, 10, 12, 15, 17, and 20, Plaintiff claims that Marsh illegally failed to promote her and/or illegally denied her promotion based alternatively on her sex, pregnancy,

marital status, parental status, sexual orientation, and/or as retaliation for complaining about discrimination.

At the outset, the Court notes that Plaintiff's failure-to-promote claims brought pursuant to Title VII are barred to the extent that they are based on allegations before September 20, 2011—300 days prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012—and Plaintiff's failure-to-promote claims brought pursuant to the DCHRA are barred to the extent that they are based on allegations before July 17, 2011—one year prior to the filing of Ms. Hammel's Charge of Discrimination on July 17, 2012. *See* Part.III.A.iii, *supra*. Accordingly, the Court shall focus its analysis on this issue to Plaintiff's allegations concerning her claim that Marsh failed to promote her in the late 2011 / early 2012 promotion cycle.[11]

Defendants argue that the Court should grant summary judgment on Plaintiff's failure to promote claim regarding her non-promotion in 2011-2012 because Ms. Hammel did not seek promotion to Senior Vice President during that cycle. *See* Def.'s Mem., ECF No. [37-1], at 17. Defendants further argue that there is "no direct evidence in the record to support an inference that Marsh made any decision concerning Ms. Hammel's promotion opportunities based on any protected status alleged in this case." *Id.* at 16.

In response, Plaintiff argues that she regularly was assigned and handled work at the Senior Vice President level during the relevant 2010-2011 time period, and that it was not necessary for her to "seek promotion" in order to be promoted to Senior Vice President. *See* Pl.'s Opp'n, ECF No. [42], at 26-29. Plaintiff contends that the "promotion process was a free-for-all subjective and mysterious morass" and that managers rarely, if ever, reviewed any criteria when making their

---

[11] The court notes that because Plaintiff's claims regarding non-promotion in 2009 and 2010 are time barred, the Court finds it unnecessary to address Plaintiff's arguments regarding "spoliation of evidence" concerning those claims. *See* Pl.'s Opp'n, ECF No. [42], at 31-34.

decisions regarding VP-to-SVP promotions. *Id.* at 26 (citing Brew Dep. Tr., Defs.' Ex. 6, ECF No. [37-3], at 52-56; Wallace Dep. Tr., Defs. Ex. 14, ECF No. 37-3], at 21:20-22). Plaintiff also argues that around the time that Ms. Hammel's supervisor, Damien Brew, made the decision not to nominate Ms. Hammel for a promotion, Mr. Brew also lowered Ms. Hammel's prior performance rating of a 4 to a rating of 3, or "Meets Expectations." *See* Pl.'s Resp. Stmt. ¶ 94d; Hammel 2011 Performance Review, Pl.'s Ex. 25, ECF No. [44-8]. Plaintiff also cites evidence indicating that the 2011-2012 promotion decision was made while she was on maternity leave, and that Mr. Brew could not recall any specific reason why he lowered Ms. Hammel's performance rating. *See* Brew Dep. Tr., Defs.' Ex. 6, ECF No. [37-3], at 108:09-111:24. In addition, Plaintiff cites deposition testimony by Mr. Brew acknowledging that he had "concerns" about the need to "shuffle clients around" while Ms. Hammel was on maternity leave. *Id.* at 113:08-13.

Upon review of the parties' submissions and the record evidence as a whole, the Court finds that Plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for her non-promotion in 2011-2012, and that the "employer intentionally discriminated against the employee" on the basis of her sex, sexual orientation, parental status, and/or pregnancy. *Brady*, 520 F.3d at 494. The evidence submitted by Plaintiff can be inferred in different ways, including to support a conclusion that Defendant's explanation is "unworthy of credence" and thus "probative of intentional discrimination," or to support Defendants' explanations for their decisions. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000). However, the Court also notes that the evidence produced by Plaintiff specifically as to her non-promotion in 2011-2012 raises a question only with respect to her sex, sexual orientation, parental status, and/or pregnancy. There is no evidence in the record that Mr. Brew's decision not to nominate her for promotion in 2011-2012

was based on her marital status and/or as retaliation for complaining about discrimination. In so finding, the Court notes that Plaintiff has produced no evidence indicating that Mr. Brew considered Plaintiff's complaints of harassment by Ms. Lieberman when deciding not to nominate her for promotion in 2011-2012. The Court further notes that Plaintiff's complaint of harassment by Ms. Lieberman with regard to Plaintiff's obligations to work from home while on maternity leave did not occur until January 2012, which would have been after Mr. Brew decided whether or not to nominate Plaintiff for promotion in 2011-2012. *See* Brew Emails, Def.'s Ex. 34, ECF No. [37-5].

Accordingly, the Court shall dismiss Claims 6 and 17 (retaliation) and Claim 12 (marital status) to the extent that they allege discrimination with respect to Plaintiff's non-promotion. The Court notes, however, that Claims 6, 12, and 17 are not dismissed in their entirety, as these claims also contain allegations regarding disparate pay. *See* Part III.B, *supra*.

### D. Hostile Work Environment (Claims 1, 3, 5, 7, 9, 11, 14, 16, and 19)

Finally, in claims 1, 3, 5, 7, 9, 11, 14, 16, and 19, Plaintiff claims that she was harassed and subjected to a "hostile work environment" at Marsh that was based alternatively on her sex, pregnancy, marital status, parental status, sexual orientation, and/or as retaliation for complaining about discrimination. [12]

"To make out a claim under the DCHRA for creating a hostile work environment, a plaintiff must prove (1) that [she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class,

---

[12] The Court notes that Plaintiff's hostile work environment claims shall be treated as "continuing violations," pursuant to the Supreme Court's decision in *Morgan*, and that they are therefore not barred by the applicable statutes of limitations under Title VII and the DCHRA. *See* Part III.A.iv, *supra*.

and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Cole v. Boeing Co.*, 845 F. Supp. 2d 277, 287 (D.D.C. 2012) (citing *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245 (D.C. 2009)) (internal quotation marks omitted). "A work environment is actionably hostile when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Id.* (citing *Barrett*, 979 A.2d at 1245) (internal quotation marks omitted). The same elements are required for Plaintiff to bring a hostile work environment claim under Title VII. *See, e.g., Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002).

A claim of retaliation based on harassment and hostile environment consists of several individual acts that "may not be actionable on [their] own" but become actionable due to their "cumulative effect." *Morgan*, 536 U.S. at 115; *see also Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). The acts must be "adequately linked" such that they form "a coherent hostile environment claim." *Baird I*, 662 F.3d at 1251. For example, the acts may "involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers." *Id.* (alterations omitted). In addition, the acts must be "of such severity or pervasiveness as to alter the conditions of . . . employment and create an abusive working environment." *Hussain*, 435 F.3d at 366 (quotation marks and alterations omitted). In examining these factors, a court should look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Here, Defendants argue that "[a]t most, Ms. Lieberman was a demanding, unreasonable and at time, rude and inconsiderate boss," but that "there is no evidence that she acted in such a manner because of any of Ms. Hammel's protected statuses." Defs.' Mem., ECF No. [37-1], at 19. Defendants concede that Ms. Hammel complained to various managers and Marsh Human Resources and that Marsh management counseled Ms. Lieberman about her style. *See id.* Defendant contend, however, that "there is no evidence whatsoever that Ms. Lieberman or anyone harassed or imposed a hostile work environment on Ms. Hammel *because of her sex, sexual orientation, marital status, parental status, pregnancy, or in retaliation for making complaints.*" *Id.* at 20 (emphasis added).

In response, Plaintiff contends that Ms. Lieberman's conduct went beyond mere "rude and inconsiderate" behavior and instead amounted to a "campaign to undermine" Ms. Hammel's "integrity, work ethic and intelligence…the central aspects of Ms. Hammel's professional identity." Pl.'s Opp'n, ECF No. [42], at 35. Plaintiff contends that the harassment is sufficiently "severe and pervasive" on the grounds that the alleged conduct "touched nearly every aspect of Ms. Hammel's employment." *Id.* at 36. Plaintiff contends that such behavior included, *inter alia*, (1) threats allegedly made by Ms. Lieberman to Ms. Hammel after Ms. Hammel complained of Ms. Lieberman's behavior; (2) attempts allegedly made by Ms. Lieberman to "belittle Ms. Hammel's intelligence and smear Ms. Hammel's reputation to Mr. Brew, Mr. Nikolai, and others;" (3) "snide and openly derogatory comments regarding Ms. Hammel's sexual orientation." *Id.* at 35-39.

Plaintiff further contends that the nexus to each of her asserted protected grounds is established "because of the temporal proximity of materially adverse actions to [Ms.] Hammel's protected acts." *Id.* at 40. Plaintiff contends that the record evidence demonstrates that Ms.

Lieberman and other managers made threatening statements and took retaliatory actions in response to her complaints, and that "the timing of Defendants' retaliatory adverse actions to Ms. Hammel's protected activity further supports Ms. Hammel's claim she was subjected to ongoing reprisal because of her complaints of sex and sexual orientation harassment." *Id.* at 41. Plaintiff also argues that Ms. Lieberman and Mr. Nikolai made overtly derogatory references to Ms. Hammel's and other Marsh employees' sexual orientation, and that Ms. Lieberman "could not get past the idea that Ms. Hammel's performance could be rewarded by someone, or that someone could be her friend, unless that person was also gay." *Id.* at 44 (citing Pl.'s Resp. Stmt. ¶ 28a-f). Plaintiff also cites Ms. Hammel's testimony that Ms. Lieberman routinely referenced Ms. Hammel's cufflinks, style of dress, and athleticism in a derogatory and stereotypical manner, stating "that's who you people are"—an alleged reference to lesbians. *See id.* Plaintiff also contends that the record evidence raises an inference that Ms. Hammel's pregnancy status and maternity status "played a role in Defendants' low performance appraisal of Ms. Hammel in December 2011 and denial of her promotion and transfer request in early 2012 after complaining about Ms. Lieberman's harassment during Ms. Hammel's maternity leave." *Id.* at 45.

Upon review of the parties' submissions and the record a whole, the Court finds that Plaintiff has produced sufficient evidence for a reasonable jury to find that Plaintiff was subjected to a "hostile work environment" at Marsh based on her sex, sexual orientation, and/or as retaliation for complaining about discrimination. *See Brady*, 520 F.3d at 494. The record evidence raises a triable questions of fact as to whether Ms. Lieberman has been subjected to unwelcome harassment and whether any such harassment was based on her sex, sexual orientation, and/or as retaliation for complaining about discrimination. *See id.* However, Plaintiff has produced no evidence that any hostile actions allegedly taken by Ms. Lieberman were made *because* Plaintiff was pregnant

or parenting or because Plaintiff was married.   Accordingly,  the Court shall dismiss Plaintiff's

hostile work environment claims based on pregnancy (Claims 7 and 19), parental status (Claim 9),

and marital status (Claim 11).

## IV.  CONCLUSION

For the reasons discussed above, the Court shall GRANT-IN-PART and DENY-IN-PART

Defendant's [37] Motion for Summary Judgment.  Specifically,  the Court finds the following:

- Plaintiff's disparate pay claims brought under Title VII (Claims 15, 17, and 20) are not barred by the applicable statute of limitations.

- Plaintiff's disparate pay claims brought under the DCHRA (Claims 2, 4, 6, 8, 10, and 12) are barred by the applicable statute of limitations to the extent that the allegations underlying those claims involve actions that allegedly took place *before* July 17, 2011; however, Plaintiff is not barred on statute of limitations grounds from asserting disparate pay claims pursuant to the DCHRA concerning events *after* July 17, 2011.

- Plaintiff is barred from asserting non-promotion claims pursuant to Title VII (Claims 15, 17, 20) that are based on allegations before September 20, 2011, and Plaintiff is barred from asserting non-promotion claims pursuant to the DCHRA (Claims 2, 4, 6, 8, 10, 12) that are based on allegations before July 17, 2011; however, Plaintiff is not barred on statute of limitations grounds from asserting non-promotion claims after those respective dates.

- Plaintiff has produced sufficient evidence for a reasonable jury to find that Plaintiff was illegally denied compensation based on her sex, pregnancy, marital status, parental status, sexual orientation, and/or as retaliation for complaining about discrimination (Claims 2, 4, 6, 8, 10, 12, 15, 17, and 20).

- Plaintiff has produced sufficient evidence for a reasonable jury to find that Plaintiff was not promoted in late 2011 / early 2012 on the basis of her sex (Claims 2 and 15), sexual orientation (Claim 4), parental status (Claim 10), and/or pregnancy (Claims 8 and 20).  However, Plaintiff has not produced sufficient evidence for a reasonable jury to find that Plaintiff was not promoted in late 2011 / early 2012 on the basis of her marital status (Claim 12) or as retaliation (Claims 6 and 17).

- Plaintiff has produced sufficient evidence for a reasonable jury to find that Plaintiff was subjected to a "hostile work environment" at Marsh based on her sex (Claims 1 and 14), sexual orientation (Claim 3), and/or as retaliation for complaining about discrimination (Claims 5 and 16).  However, Plaintiff has not produced sufficient evidence for a reasonable jury to find that Plaintiff was subjected to a "hostile work

environment" based on pregnancy (Claims 7 and 19), parental status (Claim 9), and marital status (Claim 11).

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
